936 So.2d 226 (2006)
Stacy Michelle HEFLIN, Plaintiff-Appellant,
v.
AMERICAN HOME WILDWOOD ESTATES, L.P., and Republic Vanguard Insurance Company, Defendant-Appellee.
No. 41,073-CA.
Court of Appeal of Louisiana, Second Circuit.
July 12, 2006.
*228 Kitchens, Benton, Kitchens & Black by Clinton C. Black, Minden, for Appellant, Stacy Michelle Heflin.
Robert Ashley Jahnke, Shreveport, for Appellees, Republic Vanguard Insurance Company, Percy Lee Melton, and Martha Wilma Riggs Melton.
Before BROWN, CARAWAY and DREW, JJ.
DREW, J.
Stacy Heflin appealed a judgment rejecting her claim for the damages incurred when she tripped and fell over a speed bump at the mobile home park where she resided. For the following reasons, we affirm the trial court's judgment.

FACTS
Heflin and her family were tenants of the Wildwood Estates Mobile Home Park in Caddo Parish, Louisiana. On December 8, 1999, Heflin escorted her son to his school bus that stopped inside the mobile home park. As she returned from the school bus stop to her home, while carrying her three-year-old daughter, she tripped and fell over a speed bump in the street. She subsequently filed suit against Percy Lee Melton and Martha Wilma Riggs Melton, the owners of the mobile home park, and against Republic Vanguard Insurance Company, the Meltons' insurer.
Heflin based her claims on both negligence and strict liability, asserting that the defendants knew or should have known that the speed bump was a hazard to pedestrians; that the defendants had ample time and opportunity to paint, mark, or fix the speed bump; and that the defendants failed to provide adequate street lighting.
The parties agreed to bifurcate the case so that the liability issue would be tried first. Heflin testified that:
 The speed bump at issue was located between her trailer and the trailer next door, and that the school bus regularly stopped in front of the trailer next door.
 On the morning of the accident, the school bus came to a stop after all of its tires had passed over the speed bump, although the rear portion of the *229 bus beyond the back wheels was still over the speed bump.
 She had accompanied her son to the school bus in order to talk to the bus driver about an altercation between her son and another student the previous afternoon.
 After speaking with the driver, she walked along the side of the bus toward the rear on her way back to her trailer and tripped over the speed bump and fell. She was carrying her three-year-old daughter when she fell.
 Her family had been living in the mobile home park for a couple of months before the accident, and that she was aware of the speed bumps.
 The speed bump had been there ever since she had lived in the mobile home park. The speed bumps in the mobile home park were there to slow cars down. She approved of the presence of the speed bumps.
 The speed bump was darker in color than the roadway itself but was not level or regular in its shape.
Although Heflin initially testified that she did not cross the speed bump on her way to speak to the bus driver, her testimony was contradicted by her prior deposition testimony. She then admitted that she probably crossed over the speed bump on her way to the school bus, a walk of approximately 25 or 30 steps. When asked on redirect examination why she fell on the speed bump even though she knew it was there, she stated:
Like I said when I walked back going back to the house I just tripped over that speed bump. I didn't see it even though I knew it was there. I could not see it because there was no lighting. The back of the bus, you know you've got the tires in the back end of the bus was over the speed bump and I did not see it. That's just the truth. It was darker than the road and it was dark and I couldn't see it.
Earlier in her testimony, Heflin had indicated that it was still dark outside at the time of the incident, that the street light adjacent to the speed bump was not working that morning, and that when the light was not working, one could not see the speed bump. According to Heflin, there was no paint of any kind applied to the speed bump, nor were there any reflectors of any kind on the speed bump to make it more visible.
Photographs of the speed bump were introduced into evidence through Heflin's testimony. The photographs showed that the speed bump was not pre-formed, but appeared to be made of asphalt that had been placed upon the roadway and formed into a rounded shape extending across the roadway. Logs were present on the sides of the road, just off the roadway near each speed bump. The logs apparently were to prevent drivers from avoiding the speed bumps by going around the edge onto the grassy areas adjacent to the roadway. On one side of the roadway, near the ends of the logs farthest from the roadway, there were street lights. The photographs showed that during daylight hours, the speed bumps were clearly visible.
The two early-morning photos showing the school bus stopped in the dark at the bus stop were taken from a distance and very dark. Those photos were of no value in determining how the speed bump at issue would appear to a person walking alongside the bus if the adjacent street light was not working. Nevertheless, Heflin did indicate that she was aware of the logs in the grass next to the speed bump. In addition, she knew that she would have to walk across the logs if she walked in the yard next to the street and that she would have to step across the speed bump if she walked in the street.
*230 Heflin's husband, Ommie Heflin, testified:
 The speed bump was wider and taller on one side and had "jagged edges on the round parts."
 The speed bump was asphalt in nature and looked like "it was handmade instead of having a professional do it. There was a lot of unevenness to it."
 There was neither paint nor reflectors on the speed bump. When it was dark outside, one could not really see it unless there were headlights shining on it.
 A couple of days before the accident, "a little kid down the street shot the light out" and he had told the Meltons that the light needed to be replaced.
 The speed bumps were good for the people living in the mobile home park, and he did not want to see any children get run over by a speeding vehicle.
Percy Melton estimated that the speed bumps had probably been in place seven months prior to the incident, and he admitted that the Heflins were not allowed to fix either the road or the street light. However, he disputed that he was notified prior to the accident that the street light in question was not working, and he denied any familiarity with the speed bump being uneven in height across its top. When asked why he did not paint the speed bump with some type of warning color, he responded, "No reason." He also stated that based upon his observations of the speed bump at night, the speed bump did not blend in with the road. He stated that the bump was "blacker" than the roadway and could be seen, thus alerting tenants of the bump's presence. Nevertheless, he agreed that if the speed bump had been painted or striped, or had a reflector, it would have been easier to see. The parties stipulated that Martha Melton's testimony would be substantially the same as her husband's. The court then took the case under advisement.
The trial court issued a written opinion finding that the speed bumps were not defective, did not constitute an unreasonably dangerous condition or obstacle, and were "obvious to and known by plaintiff." Accordingly, the court rejected Heflin's demands and signed a written judgment in favor of the defendants.

DISCUSSION
The issues herein are governed primarily by the provisions of former Article 2695 of the Louisiana Civil Code, which provided at the time of this accident:
The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
Under these provisions, a lessor guaranteed his lessee against all vices and defects of the thing leased; this strict liability was not repealed by implication through tort reform legislation that enacted Civil Code Article 2317.1[1] concerning an owner or *231 custodian's liability for damages occasioned by the ruin, vice, or defect in things. Barnes v. Riverwood Apartments Partnership, 38,331 (La. App.2d Cir.4/7/04), 870 So.2d 490, writ denied, XXXX-XXXX (La.6/25/04), 876 So.2d 845.
In order for Heflin to recover, she had to prove by a preponderance of the evidence that the defect existed in the premises and that the defect caused her damages. Under former Article 2695, Heflin had to prove that a defect under defendant's control posed an unreasonable risk of harm. However, she did not need to prove that the owner knew or should have known of the defect which caused the damage. If the case were governed solely by provisions of Article 2317.1, then Heflin would have been required to prove that the owner knew or should have known of the defect which caused her damages, that the damage could have been prevented by the exercise of reasonable care, and that the owner failed to exercise such reasonable care.
The applicability of former Article 2695 did not prevent Heflin from also attempting to recover via negligence under Article 2317.1, which effectively turns strict liability claims into negligence claims. See Johnson v. City of Monroe, 38,388 (La. App.2d Cir.4/7/04), 870 So.2d 1105, writ denied, XXXX-XXXX (La.6/25/04), 876 So.2d 843.
However, under either burden of proof, a defect is defined essentially the same way. For purposes of former Article 2695, a defect has been defined as "a dangerous condition reasonably expected to cause injury to a prudent person using ordinary care under the circumstances." Barnes, supra. Under Article 2317.1, a defect is a condition creating an "unreasonable risk of harm," which requires the trier of fact to decide whether the social value and utility of a hazard outweighs, and thus justifies, its potential harm to others. Johnson, supra.
Because it is difficult to imagine situations in which the social value and utility of a hazard on leased premises would justify the existence of a hazard that reasonably would be expected to injure a prudent person using ordinary care, most, if not all defects under former Article 2695 also would be defects under Article 2317.1. Furthermore, under either analysis, the trial court's factual findings concerning the presence of a defect should be afforded deference, and such factual findings should only be disturbed if clearly wrong or manifestly erroneous. See Stobart v. State, 92-1328 (La.4/12/93), 617 So.2d 880.
In Reed v. Wal-Mart Stores, Inc., XXXX-XXXX (La.3/4/98), 708 So.2d 362, the supreme court noted that the surfaces of streets, sidewalks, and parking lots are commonly irregular. Moreover, it is not the duty of the party having garde to eliminate all variations in elevations existing along the countless cracks, seams, joints, and curbs.
In the instant case, we detect no manifest error in the trial court's decision that the speed bumps at the mobile home park did not constitute an unreasonably dangerous condition. The jurisprudence contains cases finding speed bumps were not unreasonably dangerous. In Moncla v. Albertson's, Inc., 95-1139 (La.App.3d Cir.1/31/96), 670 So.2d 316, writ denied, 96-0555 (La.4/19/96), 671 So.2d 921, the plaintiff tripped over a speed bump in *232 front of a grocery store despite the fact that she had been to the store on many prior occasions and knew the speed bumps were present. There was no indication of any prior accidents involving the speed bumps, and there was no expert testimony presented by either side. When asked what might have been done to prevent her accident, the plaintiff stated that the speed bump in question "could have been a little lower or more brightly marked." The appellate court found that the speed bumps served a useful purpose and that the plaintiff produced insufficient evidence to show that the speed bump was unreasonably dangerous; she simply proved that "it was there and she fell."
Likewise, in Doane v. Wal-Mart Discount Stores, Inc., 96-2716 (La.App. 4th Cir.6/25/97), 697 So.2d 309, writ denied, 97-1852 (La.10/17/97), 701 So.2d 1328, the appellate court concluded that a speed bump did not present an unreasonable risk of harm to a customer who tripped over it while walking in the store's parking lot. The plaintiff admitted she was not looking where she was going, and the trial court had found that although the paint on the speed bumps was fading, they were obvious to a reasonable person. The trial court found that the speed bumps were necessary, despite presenting a hazard to pedestrians. However, the trial court found the defendant was at fault for painting the speed bumps the same color as the stripes in the crosswalk, thus causing the paint on the speed bumps to lose its effectiveness as a warning device. The appellate court reversed, finding that no matter what color the speed bump was painted, the plaintiff would not have seen it; thus, its color could not constitute an unreasonable risk of harm. Furthermore, there was neither expert testimony nor lay testimony for that matter, that painting the speed bumps the same color as the stripe created an unreasonable risk of harm, and the plaintiff offered no design standards or studies to prove her theory that use of the same color was unreasonably dangerous. All she proved was that the speed bump was there and that she tripped on it because she was not looking where she was going.
Because speed bumps have social utility, even though they create a hazard to inattentive pedestrians, Heflin had to show more than mere hazard in order to establish that the speed bump was defective. She had to show either that the speed bump could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances, or that it was unreasonably dangerous. Heflin introduced no expert testimony. The photographs indicated there was nothing unusual about these speed bumps, even if they were not perfectly uniform in height and width. The speed bumps were a darker color than the pavement and contrasted sufficiently in daylight hours to be quite obvious. Additionally, we note that Heflin admitted that she was aware of the presence of the speed bumps, and she recognized their social utility.
For the foregoing reasons, the trial court was correct in concluding that the plaintiff failed to carry her burden of proof of showing any defect in the design, construction, or maintenance of the speed bump. Mere irregularity in height or thickness does not constitute a defect where the plaintiff fails to show that any such irregularity caused or increased the risk of an accident.
Both Heflin and her husband indicated that the street light near the speed bump was not working at the time of the incident; Heflin further testified that one could not see the speed bump when the light was not working. Similarly, Mr. Heflin testified that when it was dark outside, *233 one could not really see the speed bump unless there were headlights shining on it. On the other hand, Mr. Melton testified that one could see the speed bumps at night. His testimony was that he inspected the property daily and had looked at the speed bumps when it was dark. He denied the speed bump blending in with the roadway because of its color, and noted that the speed bump was "blacker than the roadway was." He felt that the darker color would have alerted tenants to the speed bump's presence. His testimony also directly contradicted that of Mr. Heflin concerning his knowledge of the street light being out at the time of the incident. Although knowledge of the light not working would not be a defense to strict liability under former Article 2695, the contradiction in testimony could form the basis for a credibility determination by the trial court that would bear on the general credibility of the witnesses involved.
The trial court's factual determinations in this case are governed by a manifest error standard, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of facts should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. When findings are based on determinations regarding the credibility of witnesses, the manifest error  clearly wrong standard demands great deference to the trier of fact's findings. Only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
There can be little doubt that the presence of more light, the painting of the speed bumps with brightly colored paint, and the addition of reflectors to the speed bumps would have made them easier to see. However, it is not the presence of the hazard, per se, that gives rise to liability, but the presence of either an unreasonably dangerous condition, or a dangerous condition reasonably expected to cause injury to a prudent person using ordinary care under the circumstances. In light of the conflicting testimony of the witnesses concerning the visibility of the speed bump in darkness, we cannot say that the trial court was manifestly erroneous in ruling against Heflin. Nor do we conclude that because the trial court did not specifically mention the lighting in its opinion that the trial court failed to consider evidence concerning the lighting in reaching its ruling.[2]

DECREE
For the reasons set forth above, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] La. C.C. art. 2317.1, effective April 16, 1996, states: "The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case."
[2] Cf. Ashworth v. Wal-Mart Stores, Inc., 2003-802 (La.App.3d Cir.12/10/03), 861 So.2d 753.